APPEAL NO. 22-10229

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

SERVILLANA SORIANO,

Defendant-Appellant.

_____

FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

District Court No. 1:20-cr-00007-RVM-1

_____

**APPELLANT'S OPENING BRIEF**

_____

Mark B. Hanson, Esq.
Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738, Box 10,000
Saipan, Northern Mariana Islands 96950
Telephone: (670) 233-8600
Fax: (670) 233-5262
E-mail: markbhanson@gmail.com

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S BAIL STATUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

ARGUMENT

    I.   The Government's Intentional Solicitation of False Testimony from
        Monica Verma Was Material Constitutional Error. . . . . . . . . . . . . . . . 41
        1. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
        2. The prosecutor intentionally solicited trial testimony
           he knew or should have known was false. . . . . . . . . . . . . . . . . . . . . 42
        3. It is reasonably likely that Verma's false testimony
           could have affected the judgment of the jury in the trial below. . . . 46

    II.  The Written Statement Was Patently Unreliable in Various
        Material Respects and its Admission Against Ms. Soriano at Trial Was
        Improper, Prejudicial and Affected the Outcome of the Case. . . . . . . 48
        1. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
        2. The Written Statement was testimonial hearsay that lacked
           sufficient indicia of reliability and its admission at trial
           was prejudicial reversible error. . . . . . . . . . . . . . . . . . . . . . . . . . . 49
        3. The Use of the *Aifang Ye* Written Statement Process to Shield
           SA Jonas from Cross-Examination Regarding the Actual Statements
           Ms. Soriano Made During Her March 27 Interrogation Violated
           Her Confrontation Clause Rights. . . . . . . . . . . . . . . . . . . . . . . . . . 54

III.  Without False Testimony and Inadmissible Hearsay, There Was Insufficient Evidence at the Trial from Which Any Reasonable Juror Could Have Found Ms. Soriano Guilty of a Conspiracy to Defraud the United States Beyond a Reasonable Doubt.. . . . . . . . . . . . . . . . . 58

1. Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

2. There was insufficient admissible evidence at trial from which any reasonable juror could have found Ms. Soriano guilty of a conspiracy to defraud the United States. . . . . . . . . . . . . . . . . . . . . 59

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

## TABLE OF AUTHORITIES

CASES:

*Belmontes v. Woodford*, 350 F.3d 861 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . 41

*Bullcoming v. New Mexico*,
564 U.S. 647, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011) . . . . . . . . . . . . . 50

*Crawford v. Washington*,
514 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) . . . . . . . . . . . 34, 50

*Evans-Smith v. Taylor*, 19 F.3d 899 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . 60

*Hall v. Director of Corrections*, 343 F.3d 976 (9th Cir. 2003) (per curiam) . 42

*Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) (en banc) . . . . . . . . . 41, 45, 47

*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) . . . 58

*Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) . . . 42

*Melendez-Diaz v. Massachusetts*,
557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009) . . . . . . . . . . . . . 50

*Mikes v. Borg*, 947 F.2d 353 (9th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 59

*Morris v. Ylst*, 447 F.3d 735 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . 41, 47

*Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) . . . . 41

*N. Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir. 2001) . . . . . . . . . . . . 41

*United States v. Agurs*,
427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) . . . . . . . . . . 41-42, 47

*United States v. Aifang Ye*,
808 F.3d 395 (9th Cir. 2015) . . . 32, 32 n5, 34, 39, 40, 50, 52-54, 56-57

*United States v. Atkinson*, 990 F.2d 501 (9th Cir. 1993) . . . . . . . . . . . . . . . 59

*United States v. Bennett*, 621 F.3d 1131 (9th Cir. 2010) . . . . . . . . . . . . . . . 58

iii

*United States v. Burton*, 324 F.3d 768 (5th Cir. 2003) . . . . . . . . . . . . . . . . . 59

*United States v. Cox*, 963 F.3d 915 (9th Cir. 2020),
   *cert. denied*, 141 S. Ct. 1281 (2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*United States v. Duenas*, 691 F.3d 1070 (9th Cir. 2012) . . . . . . . . . . . . . . . 48

*United States v. Edwards*, 235 F.3d 1173 (9th Cir. 2000) . . . . . . . . . . . . . . 48

*United States v. Felix-Jerez*, 667 F.2d 1297 (9th Cir. 1982) . . . . . . . . . . . . . 52

*United States v. Garcia*, 16 F.3d 341 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . 52

*United States v. Gutierrez-Salinas*,
   640 Fed. Appx. 690 (9th Cir. 2016) (unpublished) . . . . . . . . . . . . . . 51, 54

*United States v. Haines*, 918 F.3d 694 (9th Cir. 2019) . . . . . . . . . . . . . . . . . 49

*United States v. Johnson*, 875 F.3d 1265 (9th Cir. 2017) . . . . . . . . . . . . . . . 48

*United States v. Lindsay*, 931 F.3d 852 (9th Cir. 2019) . . . . . . . . . . . . . . . . 48

*United States v. Mateo-Mendez*, 215 F.3d 1039 (9th Cir. 2000) . . . . . . . . . . 49

*United States v. Nazemian*,
   948 F.2d 522 (9th Cir. 1991) . . . . . . . . . . 32 n5, 34, 49-50, 52, 54-55, 57

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010) (en banc) . . . . . . . . 58

*United States v. Orellana-Blanco*,
   249 F.3d 1143 (9th Cir. 2002) (unpublished) . . . . . . . . . . . . 51, 53-54, 63

*United States v. Orm Hieng*, 679 F.3d 1131 (9th Cir. 2012) . . . . 50, 50 n8, 52

*United States v. Plouffe*, 445 F.3d 1126 (9th Cir. 2005) . . . . . . . . . . . . . . . . 1

*United States v. Romo-Chavez*, 681 F.3d 955 (9th Cir. 2012) . . . . . . 50 n8, 52

*United States v. Sullivan*, 522 F.3d 967 (9th Cir. 2008) . . . . . . . . . . . . . . . 58

*United States v. Thomas*, 453 F.2d 141 (9th Cir. 1971) . . . . . . . . . . . . . . . . 60

iv

STATUTES:

18 U.S.C. § 23.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 55
18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. § 1294 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
48 U.S.C. § 1821(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
48 U.S.C. § 1822 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
48 U.S.C. § 1824 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

REGULATIONS:

8 CFR § 214.2(w)(5) . . . . . . . . . . . . . . . . . . . . . . . . 4 n2, 24

RULES:

Cir. R. 28-2.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Fed. R. App. P. 4(b)(1)(A)(I) . . . . . . . . . . . . . . . . . . . . . . . 2
Fed. R. App. P. 28(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Fed. R. Crim. P. 16(a)(1)(G) . . . . . . . . . . . . . . . . . . . . . . . 18
Fed. R. Crim. P. 29(a) . . . . . . . . . . . . . . . . . . . . . . . . . 35, 58
Fed. R. Crim. P. 32(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Fed. R. Evid. 801(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . 39, 56

## STATEMENT OF JURISDICTION

Pursuant to Fed. R. App. P. 28(a)(4) and Cir. R. 28-2.2, Defendant/Appellant Servillana Soriano ("Ms. Soriano" or "Defendant") demonstrates the jurisdiction of the District Court and this Court by stating as follows:

a.    The District Court exercised subject-matter jurisdiction pursuant to 48 U.S.C. § 1822, 18 U.S.C. §§ 23.1 and 3231;

b.    This Court has jurisdiction pursuant to 48 U.S.C. § 1824 (providing that those portions of Title 28 of the United States Code which apply to the District Court of Guam shall apply to the District Court for the Northern Mariana Islands); 28 U.S.C. § 1291 (establishing appellate jurisdiction of the courts of appeals over final orders of the District Court of Guam); 48 U.S.C. § 1821(a) (placing the Northern Mariana Islands in same judicial circuit as Guam); and 28 U.S.C. § 1294 (placing Guam in the Ninth Circuit). This Court exercises jurisdiction to review the sentencing proceedings below pursuant to 18 U.S.C. § 3742(a). *United States v. Plouffe*, 445 F.3d 1126 (9th Cir. 2005).

c.    The District Court's Judgment, originally filed on September 9, 2022 and amended on September 12, 2022, is final and appealable. 1 ER 1-7. *See* Fed.

Page 1 of 67

R. Crim. P. 32(d)(1).

d.     The District Court's original Judgment was entered on September 9, 2022. 1 ER 1. Ms. Soriano's Notice of Appeal was filed on September 14, 2022. 2 ER 350-358. This appeal is timely. *See* Fed. R. App. P. 4(b)(1)(A)(I).

## DEFENDANT'S BAIL STATUS

Ms. Soriano has completed the incarceration portion of her sentence and is on home detention until August 2023. 1 ER 1-7.

## STATEMENT OF ISSUES

I.     WHETHER THE GOVERNMENT'S INTENTIONAL SOLICITATION OF MATERIAL TESTIMONY IT KNEW OR SHOULD HAVE KNOW WAS FALSE WAS REVERSIBLE CONSTITUTIONAL ERROR.

II.    WHETHER THE ADMISSION OF A STATEMENT SIGNED BY DEFENDANT SORIANO WAS INADMISSIBLE, PREJUDICIAL HEARSAY BECAUSE MATERIAL STATEMENTS THEREIN WERE NOT HER OWN AND LACKED SUFFICIENT INDICIA OF RELIABILITY.

III.   WHETHER THERE WAS SUFFICIENT ADMISSIBLE EVIDENCE AT TRIAL FROM WHICH ANY REASONABLE JUROR COULD HAVE FOUND MS. SORIANO GUILTY BEYOND A REASONABLE DOUBT.

## STATEMENT OF THE CASE

This is an appeal from a criminal action brought by the United States against Appellant Servillana Soriano ("Ms. Soriano") and two co-defendants. Ms. Soriano and her co-defendants/alleged co-conspirators were originally indicted in July 2020 on the sole count of Conspiracy to Defraud the United States in violation of 18 U.S.C. § 371. *See* Indictment, Doc. 4, 2 ER 361 (Docket).

### The Indictment

The Indictment alleged a conspiracy between Ms. Soriano and others to fraudulently obtain non-immigrant, employment-based status and employment authorization for three overstaying aliens in Saipan. As charged in Second Superseding Indictment ("SSI") on which Ms. Soriano was tried, Ms. Soriano and the others individuals conspired to defraud the United States Citizenship and Immigration Service ("USCIS") by "impairing, obstructing, and defeating" its "fair and objective evaluation of petitions to classify aliens as CW-1 workers." 2 ER 203-204.

The crux of the alleged conspiracy was a "fraudulent" non-immigrant petition for temporary workers (the "Petition") submitted to USCIS by Ms. Soriano through petitioner RES International LLC, the family company she

managed ("RES" or the Company).[1] 3 ER 457. The Petition sought approval to employ three non-resident alien individuals as "CW-1 workers" in Saipan for a one-year term.[2] 2 ER 91-92 (SSI); 2 ER 206 (Trial Ex. 2). Ms. Soriano agreed to have RES submit the offending Petition at the request of and as a favor to the intended beneficiaries' uncle and indicted co-conspirator Halim Khan. 4 ER 687.

To process the Petition for Mr. Khan's three relatives, Ms. Soriano enlisted the assistance of one Arnold Reyes to navigate the process and to prepare the Petition with all of the necessary supporting documents. 4 ER 683-695 (direct testimony of Arnold Reyes). Reyes was employed at the time as a bookkeeper for a medical services company in Saipan on a CW-1 work permit. 4 ER 680-81. Reyes had his own side-business preparing tax filings and immigration petitions for various Saipan companies and individuals including RES. 4 ER 681-83; 746-757.

---

[1] The Petition was a USCIS Form I-129CW, Petition for a CNMI-Only Nonimmigrant Transitional Worker (08/01/18 ver.). 2 ER 206-316. Form I-129CW "is used by an employer to petition [USCIS] for an alien to come as a nonimmigrant to the Commonwealth of the Northern Mariana Islands (CNMI) temporarily to perform services or labor as a CW-1, CNMI Only Transitional Worker, an alien worker who will enter or remain in the CNMI for the purpose of employment during the transition period . . . ." 2 ER 93.

[2] A "CW-1 worker" is the alien beneficiary of a Form I-129CW Petition. *See generally* 8 C.F.R. § 214.2(w)(5).

Prior to filing the Petition with USCIS, Reyes determined the "basis" for the CW-1 petition with the best probability for success, prepared and posted an online "job vacancy announcement" for the employment positions though an online account and Hotmail address (both of which Reyes established and monitored for RES), had the positions advertised in radio spots and instructed Ms. Soriano to collect supporting from the beneficiaries (copies of passports and certificates of prior employment). 4 ER 685-697 (Reyes direct), 772, 776, 779-781, 795-797 (Reyes cross); 2 ER 221-225 (Trial Ex. 1). Reyes also prepared employment offer letters and employment contracts for RES and the alien beneficiaries to execute. 4 ER 688-89 (Reyes direct); 2 ER 241-52 (Trial Ex. 1).

As instructed by Reyes through Ms. Soriano, the three alien beneficiaries each provided a copy of their passport and a "Certificate of Employment" to accompany the Petition. 4 ER 690 (Reyes direct); 2 ER 245-53 (Trial Ex. 1). Reyes supplemented the supporting documentation with various other documents he obtained or prepared including RES' organizational documents, its business license, tax filings and other business records of RES that Reyes himself maintained for the Company. 4 ER 605 (Reyes direct); 2 ER 219-220, 226-240, 271-304 (Trial Ex. 1).

Once Reyes completed and assembled the Petition, prepared the mailer and RES' company checks for the statutory fees, Reyes had Richard Soriano (Ms. Soriano's son and sole LLC member) sign the Petition and its accompanying cover letter and Reyes had Ms. Soriano sign the checks. 5 ER 808-09. Reyes then mailed the Petition packet to USCIS' California Service Center for filing and processing. 5 ER 810; 2 ER 313 (Trial Ex. 1).

The three beneficiaries each gave Ms. Soriano $900.00 for the preparation and filing of the Petition. 2 ER 319 (Trial Ex. 3 - Soriano handwriting); 5 ER 894 (Jonas direct). In turn, Ms. Soriano paid the statutory fees to USCIS for the petition and each of the beneficiaries, the costs of advertising the position for any available US workers, the document reproduction costs, postage expenses, Arnold Reyes' per-beneficiary service fees and other incidental expenses associated with the Petition. 4 ER 694-95 (Reyes direct); 2 ER 310-315 (Trial Ex. 1).

The Government's belief is that the Petition was "bogus," submitted by Ms. Soriano in exchange for money and only to obtain "status" for the three out-of-status relatives of Mr. Khan who, the Government alleges, were not actually going to work for Ms. Soriano's petitioning company, but instead would use a supposed

grant of immigration "status" to find their own at-will employment elsewhere in Saipan. *See*, *e.g.*, 3 ER 419-20 (excerpt from Government opening arguments).

In any case, almost six months after it was filed, USCIS approved the Petition in February 2019 for the beneficiaries' "CW-1 classification" (not status nor a visa) and notified the Petitioner through Ms. Soriano that each of the beneficiaries would then have to procure a CW-1 non-immigrant visa from the United States Department of State at the US Embassy in Dhaka, Bangladesh after which they could return to Saipan with a valid immigration status and employment authorization. 2 ER 206 (Trial Ex. 1); 3 ER 540-41 (Verma cross); 4 ER 792-94 (Reyes cross).

There was no evidence that after USCIS approved the Petition granting the CW-1 classifications requested therein any of the three beneficiaries actually returned to Bangladesh to process an employment visa.

### The HSI Interrogation

Over a year after receiving the effectively impotent Petition approval notice from USCIS and moving on from their planned employment with RES, Homeland Security Investigations ("HSI") agents in Saipan identified RES as recent petitioner of three Bangladesh nationals involved in HSI's investigation of a

different employer for whom the three non-immigrant aliens had initial come to Saipan to work several years earlier. 3 ER 456-57 (Jonas direct). That initial inquiry into RES and suspicious HSI agents' review of the Petition and its supporting documents led to a March 2020 interrogation of Ms. Soriano at HSI's Saipan Field Office. 3 ER 457.

HSI Special Agent Fredric Jonas ("SA Jonas" or "Jonas") and another agent first contacted Ms. Soriano on March 27 at her home in Saipan and asked her to go with them to their Saipan field office for a "consensual interview." 5 ER 854-55 (Jonas direct). Because Ms. Soriano is not fluent in English, the HSI agents called a telephonic interpretation service contractor for Tagalog language services to assist in their interrogation. *Id.* Through SA Jonas' communications directed to and from the telephone interpreter, the HSI agents conducted their interrogation. 5 ER 857.

Shortly after their interrogation of Ms. Soriano, SA Jonas collected interview notes from the other agents in that were, at times, in the interrogation and prepared a Report of Investigation ("ROI"). 5 ER 861-62 (Jonas direct); 900 (Jonas cross) (Jonas had not taken any notes himself).

Three weeks later on April 17, Ms. Soriano "came to the office on her own" to review with SA Jonas a "statement of the interviewee" that SA Jonas had

prepared from the "totality" of the other agents' notes and his own memory (the "Written Statement"). 5 ER 901. The Written Statement that SA Jonas "drafted up" to present to Ms. Soriano that was "not verbatim," but was "outside the ROI" and what SA Jonas claims he did "to ensure that everything that we wrote in our ROI is also something that she could agree happened during the interview." 5 ER 862-63 (Jonas direct). Notably, neither the March 27 interrogation nor the April 17 follow-up execution of the Written Statement were electronically recorded according to SA Jonas. 5 ER 906 (Jonas cross).

Within the Written Statement that SA Jonas pre-drafted, SA Jonas intentionally included false information. 5 ER 869. There is no evidence that SA Jonas ever documented all of the intentional falsehoods he included in the Written Statement. Jonas testified, generally, that "In this case, it could be a date, it could be a number, or it could be something that she had said that we made incorrect, okay, like a date of birth." 5 ER 869. Seemingly incongruously, Jonas testified that she "caught all of [his] mistakes," though still without cataloguing all of the intentional falsehoods he had actually included in the Written Statement nor distinguishing his embedded falsehoods from other "non-verbatim" statements he included therein. 5 ER 869-70 (Jonas direct). SA Jonas claims that the intent of

that process was "to ensure the accuracy that the interpreter is translating it correctly and also to ensure that the person that we're interviewing and reading the summary to is paying attention." *Id.*

At that April 17 interaction with Ms. Soriano, SA Jonas was assisted by a different agent that was not present at the initial interrogation and he once again enlisted the assistance of a telephonic interpreter to communicate with Ms. Soriano. 5 ER 863-64.

SA Jonas testified that he went through his draft Written Statement with Ms. Soriano "line by line," the telephonic interpreter would interpret it through the "speaker phone" and SA Jonas "would require either a nod or a verbal or both from Ms. Soriano that she understood what was read to her . . . ." 5 ER 867 ("Once I got the nod, I would then read the second sentence in English.").

To keep the review of his Written Statement moving, "after the interpreter finished each sentence, [SA Jonas] would look at Ms. Soriano, and be like, 'Is that okay? Are we good? Do you agree with it?' And she would nod or give [him] a verbal yes." 5 ER 868. "I would need either need a verbal yes or at least a nod. I'm not going to assume it was okay. It is just my practice to at least get something, a verbal or physical nod." *Id.*

After he finished the line-by-line review with Ms. Soriano and she had supposedly corrected "all" of his intentionally imbedded "mistakes," SA Jonas had Ms. Soriano sign the Written Statement certifying that, in his words, she had been "given an opportunity to make any and all corrections to my written statement" and that the Written Statements was "true and correct." 5 ER 870-80; 2 ER 318-19 (Trial Ex. 3). And SA Jonas agreed with the prosecution that "she never object to [SA Jonas'] characterization of" her knowledge, intentions and the other facts and fiction she included in the Written Statement. 5 ER 896 (Jonas direct).

SA Jonas testified repeatedly that his ROI from the March interrogation incorporated *all* of the information that he then turned into the Written Statement he prepared and had Ms. Soriano sign. *See, e.g.*, 5 ER 906-911 ("They're written two different styles, but the information is identical."). According to SA Jonas, the agents at his HSI office collectively "make sure that everything we put [in Ms. Soriano's Written Statement] is actually what happened." 5 ER 909. But it is not. The March 27 ROI, the agents' notes from that interrogation and SA Jonas' draft Written Statement differ in many material respects.

Nonetheless, SA Jonas testified at trial that "in totality of the interview," what was in Ms. Soriano's April 17 signed Written Statement was actually

something she said during the March 27 interrogation, adding that "a lot of times it's me talking and getting a response from her. So ..." 5 ER 912 (emphasis added). Or, alternatively, that "everything in the April 17th statement *came from* the March 27th interview." 5 ER 932 (lines 4-5) (emphasis added). However, the balance of SA Jonas' testimony does not bear out either of those gratuitous, conclusory and seemingly dispositive contentions.

In a photo line-up done during Ms. Soriano's March 27 interrogation, for example, Ms. Soriano contemporaneously indicated in her handwriting on the photo line-up that she recognized one of the individuals pictured therein as "the brother of Halim in Kanoa Resort," but she "forgot the name." 2 ER 320 (Trial Ex. 5); 5 ER 914-915 (Jonas cross). However, the Written Statement has Ms. Soriano remembering the full name and correct spelling of not only that individual that should could not name, but more than ten other individuals and myriad other "facts" reflected in the Written Statement SA Jonas created. *See* 2 ER 318-19 (Trial Ex. 3).

The Jonas drafted Written Statement that Ms. Soriano signed was unquestionably *not* the model of consistency with regard to Ms. Soriano's "own words" in the March 27 interrogation to which SA Jonas testified — and at which

he took no notes, but relied on "the totality of the interview" and the other agents' allegedly perfect notes. 5 ER 910-915 ("At no point did anybody take inaccurate notes."); ("They take great notes, yet."); ("no inconsistencies" in the notes). *But see* SA Jonas at 5 ER 925 (lines 1-5) ("These are just notes. . . There are the totality of the -- this is not verbatim. I can't -- and I can't speak on Mr. Yamanaka's one hundred percent notes."); *id.* (line12) ("I can't speak on — for them.").

**— "I know it was wrong ..." at page 2 of the signed statement, Trial Ex. 3:**

> [DEFENSE COUNSEL:] Did she ever say she knew it was wrong on March 27th?
> [JONAS:] In totality of the conversation that we had, if she stated that to me, then that's why I put it in there, so, yes.
> [DEFENSE COUNSEL:] What -- my -- my question is much more specific, Agent Jonas. Did she ever say, "I know it was wrong," on March 27th?
> [JONAS:] Yes, that's why I put it in the report, sir.

5 ER 917.

> [DEFENSE COUNSEL:] So I'm talking about March 27th. You wrote this and had her sign it on April 17th and now you're saying, "Well, she agreed to it on April 17th." I'm asking you: Did she ever say that on March 27th, before?
> [JONAS:] During our interview, yes.
> [DEFENSE COUNSEL:] She said, "I" -- "I think it's wrong"?
> [JONAS:] When we -- when we speak, it is a two-way conversation --
> [DEFENSE COUNSEL:] Get it, but you --

[JONAS:] She acknowledges that something isn't -- shouldn't have been done, then, yes.

[DEFENSE COUNSEL:] No. Are we back to April 17th or are we March 27th?

[JONAS:] This is initial interview in March.

[DEFENSE COUNSEL:] No, no. This is the statement from April 17th.

[JONAS:] Correct.

[DEFENSE COUNSEL:] That's not the original interview in March, that's the ROI and the notes of the officers and whatever is in your head, right?

[JONAS:] Okay.

[DEFENSE COUNSEL:] Again, you can write anything in here you want on April 17th, but that doesn't mean she said it on March 27th, that just means you get her to agree to it on April 17th, right?

[JONAS:] We went over it with her. I read it to her. She had ample opportunity. That's why we go line by line, it's a very slow process. It's to ensure she understands the content and that if she agrees, it allows her to add her own words --

[DEFENSE COUNSEL:] Oh, no, I understand that. You already told the Jury that many times, that you got her to agree to that on April 17th. My question is different. On March 27th, three weeks before that, did she ever say, "I know" -- "I know it was wrong"? Did she ever utter those words. Did they come out of her mouth? Because she didn't say it this day, you did. And she -- you got her to sign this. But did she ever say those words on March 27th?

[JONAS:] If she -- if I put it down, then, yes, at some point, that was the conversation we had.

[DEFENSE COUNSEL:] Okay. So you tend to remember that she said something like that in the totality of the interview on March 27th, right?

[JONAS:] Yes.

[DEFENSE COUNSEL:] If -- one, if she had said that, wouldn't you have put it in your ROI? Soriano admits that it was wrong.

[JONAS:] That's what the statement is for.

5 ER 918-920.

[DEFENSE COUNSEL:] Did you see in there anywhere where you said, "Soriano admitted that it was wrong"?

[JONAS:] No. Just in her statement, sir.

5 ER 921.

[DEFENSE COUNSEL:] And what about in that ROI that you wrote almost immediately after this interview with the benefit of the notes from your two other special agents, that she had said anything like she was not going to -- that they were not going to be employees of RES International, LLC? Is it in your ROI, they, the three beneficiaries of the petition? Did she ever say that, that you recorded in your ROI?

[JONAS:] If it's in the ROI, she said that, yes.

[DEFENSE COUNSEL:] She said what?

[JONAS:] That she was never going to employ them.

[DEFENSE COUNSEL:] It's in -- it's in there?

[JONAS:] It's in the statement.

***

[JONAS:] Okay. I don't see it in the ROI itself, no.

5 ER 921, 922.

— "that they were not going to be employees of RES," Trial Ex. 3 at 2:

[DEFENSE COUNSEL:] How about this one. This is also from paragraph H. RES International was merely getting them status, them, presumably the beneficiaries, to remain in the CNMI and they would find their own work. Where -- did you put that in your ROI? That information? That statement? That admission?

[JONAS:] No, only in the statement.

Page 15 of 67

[DEFENSE COUNSEL:] Right. That -- so none of that's in the ROI?

[JONAS:] No.

5 ER 922.

[DEFENSE COUNSEL:] And that's basically on -- would you agree with me, that's Agent Yamanaka recording the substance of something that Ms. Soriano said in that interview?

[JONAS:] Yes.

[DEFENSE COUNSEL:] All right. So isn't that, that Ms. Soriano was expecting them to show up after they got the CW approved, and they didn't; isn't that the opposite of a pre-existing agreement that they weren't going to show up at all?

[JONAS:] It's just during -- during the interview she stated that after the three individuals received the I-797 receipt, that they didn't show up.

[DEFENSE COUNSEL:] Right.

[JONAS:] The receipt notice.

[DEFENSE COUNSEL:] Show up to work, right?

[JONAS:] I would assume so.

5 ER 923-924.

[DEFENSE COUNSEL:] So now you have in front of you your ROI from -- it's basically your report from that interview. And you have your partner, Cristin Duenas's notes from the interview that he was only listening and taking notes at. You have your boss's notes, doing the same thing. And can you find in any of those three documents anywhere where Servillana Soriano said that her -- that that company, RES International, was merely getting status so that they could remain here, and there was no intent for them to be employees of the company? Is it anywhere in any of those three documents?

[JONAS:] I don't see it.

5 ER 927.

> [DEFENSE COUNSEL: . . .] in Agent Yamanaka's notes, he also makes a notation, which is the other bubble, where we writes -- let me get this right -- "Not aware it is fraud." So, presumably, Agent Yamanaka is recording in his notes that Servillana Soriano said that she was not aware that it was fraud; is that fair to say?
>
> [JONAS:] That specific conversation was related to her paying, or taking money from the three individuals, the $900 from each individual, not being aware. That's what that part of the interview is related to; about taking the money.
>
> [DEFENSE COUNSEL:] So she wasn't aware it was fraud to take the money, but she knew it was wrong to petition them in the first place? That doesn't make any sense, does it? That's just your interpretation of his notes?
>
> [JONAS:] It's what we gathered from the interview, sir. It's the facts.
>
> [DEFENSE COUNSEL:] Well, we don't have -- this -- to be fair, I~-- this April 17th statement isn't from the interview, it's something that happened after the interview, three weeks later, right?
>
> [JONAS:] Part of the interview. It's her ability and her -- her opportunity to read what happened in the interview and agree or challenge anything that she says did or did not happen in the interview.

5 ER 928-929.

## The Motion *in Limine* to Exclude Testimony of ISO Verma

As part of its pretrial disclosures, the Government noticed its intention to

call a USCIS Immigration Services Officer Monica Verma ("Verma") to testify as

a subject matter expert at Ms. Soriano's jury trial "regarding the procedures and

requirements for CW-1 visas."[3] *See* 2 ER 91 (December 2, 2020 Correspondence, Docket No. 45-1). Pursuant to Fed. R. Crim. P. 16(a)(1)(G), the Government's disclosure broadly outlined the general subject matter of Verma's intended testimony, all of which was grounded in the application of comprehensive and complex federal regulatory law. *Id.* Notably, the Government's disclosure did not actually proffer any of Verma's actual legal interpretations or opinions with "bases and reasons" as the Rule requires nor did the Government even cite to the specific statutes and regulations that underpin the broadly proffered subject matter of Verma's testimony. *Id.*

Following that patently deficient Rule 16(a)(1)(G) disclosure and Verma's apparent lack of legal expertise in the noticed subject matter, Ms. Soriano filed a motion *in limine* to exclude Verma as unqualified and her intended legal-opinion

---

[3] The government has, somewhat inconsistently, maintained that Verma was not testifying as an expert. *See, e.g.*, 2 ER 184 (Motion Trans. at lines 22-25) (Prosecutor: "So this is lay testimony. And since it is lay testimony, I don't owe them any of these things, but I do agree, let's err on the side of caution. Let's treat it as expert witness."). Ms. Soriano continues to disagree with that contention, but for purposes of the issue raised in this appeal, the distinction is immaterial. Either way, the Government presented testimony that it knew or should have known was false and put the burden of correcting its own "subject matter expert's" false testimony on the Defendant.

testimony as incorrect, ungrounded, unreliable, irrelevant and unfairly prejudicial.

2 ER 365 (Doc. No. 72).

The Government responded to the motion *in limine* with a supplemental

disclosure, attached as an exhibit to its Response, further narrating the supposed

"bases and reasons for Ms. Verma's opinions" that including, among other things:

> - "her ongoing legal research into relevant statutory authority,
> case precedent, and USCIS policies regarding nonimmigrant worker
> I-129 CW petitions";
> - "her role as a subject matter expert for I-129CW petitions at
> USCIS";
> - "her ongoing training and review of USCIS policies pertinent
> to I-129CW petitions with respect to the Immigration Law Book and
> Title 8 of the Code of Federal Regulations, pertaining to Aliens and
> Nationality"; and
> - "her regular communications with . . . the legal department
> regarding effective implementation of USCIS policies pertinent to I-
> 129CW petitions."

2 ER 197-199 (March 27, 2021 Correspondence Ex. A, Doc. No. 79-1).

Pertinent to this appeal, the Government also proffered therein that "Ms.

Verma will further testify that it is her opinion that it is not an approved practice

to require the beneficiaries of nonimmigrant worker I-129CW applications to pay

for the fees required for submission of the petitions." *Id.*

Page 19 of 67

In support of the supplemental disclosure, the Government attached additional exhibits to its Response that included a copy of an email from Verma to the prosecutor citing, generally, to the four public laws and the entire subsection of the Code of Federal Regulations (as amended) that created, amended and governs the CNMI Only Transitional Worker Program from its inception to-date — implemented at varying times and with varying applicability to the facts of this case — referring to the general citations simply as the "regulations [] in place during the adjudications of that case." *See* 2 ER 200 (March 27, 2021 Email Ex. B, Doc. No. 79-2).

It was undisputed that RES did in fact pay all of the fees due to USCIS for the Petition, but still the Government would not confirm at the hearing on the Motion to exclude Verma's testimony that she was actually going to testify that there was "an explicit prohibition by U.S. CIS for a beneficiary to reimburse a petitioner" the various petition filing fees USCIS required. *See generally* 2 ER 128-196 (Trans. from March 30, 2021 Motion Hearing, Doc. No. 279).

Instead of acknowledging at the motion hearing the improper testimony that it intended to illicit from Verma, the Government offered a seemingly unconditional assurance to the Court:

Page 20 of 67

THE COURT (1 ER 158 lines 5-24): Not your argument, but in your supplemental notice, the summary of expert opinions. Let's focus on the last sentence. "Ms. Verma will further testify that it is her opinion," so that's the expert opinion, "that it is not an approved practice to require the beneficiaries of non-immigrant worker I-129CW applications to pay for the fees required for submission of the petition." So not on her opinion, but the expert. So let's focus on the expert. It's her opinion that it's not an approved practice.

[PROSECUTOR]: Your Honor, I will, by the end of week, I will provide the basis of that opinion with some, most likely citation to some CFR or internal policy.

THE COURT: Okay.

[PROSECUTOR]: If she's unable to, and it's just her opinion, I'll withdraw it.

THE COURT: Okay. I like that answer. . . . I'm going to allow him to supplement it.

\* \* \*

[PROSECUTOR] (1 ER 166 lines 15-20): Your Honor, I think it's pretty clear that that, as I said, when it comes to the payment, the Government will provide authority for Ms. -- Ms. Verma's opinion. And if there's authority, it's not really her opinion anymore. Sorry for my language. But if she's unable to point to some source of authority, I'll withdraw it. . . .

\* \* \*

[PROSECUTOR] (1 ER 168 lines 1-18): \* \* \* She's going to testify as to the state of the law at the time. And these changes that he keeps alluding to are all after the fact, and if she bleeds into -- believes the two changes, he will pounce on her and make her look foolish.

[DEFENSE COUNSEL]: But the bell will already have been rung.

THE COURT: Look --

[PROSECUTOR]: It's the law.

THE COURT: Okay. Hold on. But true, Mr. Backe, if you're aware or have reason to believe –

[PROSECUTOR]: I don't.

THE COURT: -- that it's improper.

[PROSECUTOR]: I don't. I don't.

THE COURT: *And that's why this is your role first to determine what is the basis of her legal authority for her underlying opinion.* And, like you said, if she even comes up with any legal authority, then you can pursue this opinion.

But if she doesn't –

\* \* \*

[PROSECUTOR] (1 ER 169-71): Yes, Your Honor. And, as I said, she's -- she does the training for the adjudicator. She does the community outreach. She's been part of the program since its inception, so all these -- and all these subsequent changes she's been a part of as we disclosed, and she will testify in line with the state of the law at the time. Again, this is the law. The USCIS doesn't go, Oh, we want to do this, we want to believe some of this and do that. And, again, Mr. Hanson is really going to pounce on her if she is -- if she is imprecise in her testimony.

[DEFENSE COUNSEL]: In my cross-examination, absolutely, but the jury already hears her super testimony. And I disagree with the courts that say that when the Government's being -- a Government witness that's introduced as the senior immigration officer gets up there and testifies to stuff that I can challenge on cross-examination is complete patently based on the wrong law that the jury that didn't already hear that believed that, and everything that comes after that is -- is

lost.

THE COURT: Disregarding any possibility striking of evidence and striking of the jury and curative instruction of the like.

[DEFENSE COUNSEL]: Even with that, Your Honor. I mean, I know that the courts really like to say that their curative instructions are -- are curative, but from defense counsel's point of view, it just is

not. It's not. I mean, obviously, it's better than nothing, but the best outcome is to not have improper testimony come in, in the first place.

     [PROSECUTOR]: I agree.

Ultimately, based on the Government's promise to supplement its disclosures including providing the defense with specific references to the legal bases for Verma's forthcoming testimony about the CW-1 Program statues and regulations, the Court denied Ms. Soriano's motion to exclude Verma's testimony. *See* 1 ER 72-78 (Memorandum Decision); 1 ER 79 (Minute Entry); 1 ER 81 (line 17) to 83 (line 23).

Thereafter, the prosecutor did supplement the Government's pre-trial disclosures with regard to the legal bases for Verma's intended testimony. *See* 2 ER 91-127 (April 2, 2021 Correspondence, Docket No. 94-1). In relevant substance, Verma's last pretrial supplement proffered her opinion that: "There has always been a regulation in place since the beginning of the program that prohibits the petitioner from charging the beneficiary filing fees." 2 ER 103. In support of her opinion of the state of the applicable law, Verma's once again cites solely to the regulation that requires that "an employer who seeks to classify an alien as a CW-1

worker must file a petition with USCIS and pay the requisite petition fee[s] . . . ." *Id.* (quoting 8 CFR § 214.2(w)(5) (version not specified)).[4]

Notably, nothing in the cited regulation prohibits the petitioning employer from using funds from the obtained from the beneficiaries to pay the filing fees and there was still no citation to any prohibition on an employer being reimbursed from a beneficiary for costs of the petition including the USCIS filing fees. *Id.* at 2 ER 103-105.

The jury trial commenced on June 30, 2021 at which the Government, through SA Jonas, entered into evidence a large portion of the Petition file (2 ER 206-316 (Trial Ex. 1)) supplemented on cross-examination by the USCIS generated adjudication notes and records constituting the remainder of the USCIS Petition file. 2 ER 321-345 (Trial Ex. A (or "1A" in the Recorder's Transcript)). 3 ER 86, 99.

---

[4] The second supplemental disclosure also cites an irrelevant discussion about payment of fees in the Federal Register in response to comments received during the notice and comment period of the initial CW-1 regulations in 2011. 2 ER 104.

Following that brief initial testimony, the Government called Verma as its next witness testifying remotely by VTC from her USCIS' office in California. 3 ER 421.

### The Verma False Testimony

On direct, Verma testified that "the [I-129CW]-- the filing fee, the education funding fee, the fraud fee is all the responsibility of the petitioner or attorney. The biometric fee can be paid by a beneficiary. So it can either be paid by the petitioner or the beneficiary." 3 ER 493.

The Government then followed up, in leading fashion, as follows:

> [PROSECUTOR:] Okay. The first ones you listed, regulations say they must be paid for by the petitioner?
> [VERMA:] Or attorney, yes.

3 ER 494 (without more).

On cross-examination, the following relevant colloquy occurred:

> [DEFENSE COUNSEL:] . . . You had testified that under the regulations that it's the responsibility of the petitioner to pay the filing fees for the petition, right?
> [VERMA:] Yes. The petitioner or the attorney.
> [DEFENSE COUNSEL:] Or the attorney for the petitioner.
> [VERMA:] Uh-huh.
> [DEFENSE COUNSEL:] And at this time, I mean, from -- from the initial -- from the 2011 regulations up until beyond this date, was

there any express regulation that prohibited the -- the CW petitioner from getting reimbursed for filing fees from the beneficiaries?

[VERMA:] There -- they -- *the petitioner is not allowed to get reimbursed any of the fees*, because then that would be an indication that the fees technically are still being collected by the petitioner. They're paying for their own petition and employment benefits in the CW world.

[DEFENSE COUNSEL:] *What regulation are you referring to?*

[VERMA:] Um, I -- truthfully, I don't know off the top of my head what exact regulation it is, but I know that it is prohibited from not collecting or deducting or reimbursing the petitioner with the fees that they paid for their forms.

3 ER 591-592 (emphasis added).

Undeterred by the lack of any actual legal authority for Verma's unsanctioned "opinion," the Government on re-direct gratuitously solicited the following additional, improper testimony from Verma:

[PROSECUTOR:] Mr. Hanson asked you about U.S. CIS having a regulation or a rule or something talking about petitioners not being able to seek reimbursement from the beneficiaries.

[VERMA:] Right.

[PROSECUTOR:] And it was your -- it was your testimony that there was a specific rule in place during the time of this petition preventing reimbursement from the beneficiary?

[VERMA:] Right. So in our regulation, it states that the petition -- or, sorry, the petitioner or the -- actually, I think it only states the petitioner must pay for those fees. In regards to like the reimbursements and everything, I don't know exactly where that is written.

[PROSECUTOR:] But is it your testimony that it was in place at the time?

> [VERMA:] Yes.
>
> [DEFENSE COUNSEL]: Objection, Your Honor, to "it was in place." What was in place?
>
> [PROSECUTOR]: An explicit prohibition by U.S. CIS to – for a beneficiary to reimburse a petitioner.
>
> THE COURT: In the regulation?
>
> [PROSECUTOR]: Yes. Well, I mean -- I want --
>
> THE WITNESS: Yes.
>
> [PROSECUTOR]: Does she -- you can --
>
> [PROSECUTOR:] The answer is there was a regulation in place?
>
> [VERMA:] There is a regulation in place, yes. I just don't -- I – unfortunately, I don't know exactly where it is, 'cause it's not directly in the CW-1 regulations.
>
> [PROSECUTOR:] Okay. But there was an express prohibition in place at the time of this petition?
>
> [VERMA:] Yes.

3 ER 631-632.

Verma's testimony concluded shortly thereafter and the Government called two fact witnesses, including Arnold Reyes, and then recalled the case agent SA Jonas. *See generally* 2 ER 205 (Clerk's Exhibits and Witness List, Doc. 145-1). Following SA Jonas' additional testimony (discussed in further detail below), the trail court excused the jury, in part, to address with counsel Ms. Soriano's continuing objection to the Government presenting legally unsupported "opinion" evidence through Verma on the subject of a supposed fee reimbursement prohibition, "explicit" or otherwise. 1 ER 37-61.

In that lengthy discussion, Ms. Soriano argued that Verma's testimony was both unsupported and legally erroneous, that the Government was on notice, had ample opportunity to inform itself of the applicable law (or the absence thereof), had promised to do so pre-trial and now had a duty to correct Verma's false testimony. *Id.*

Without any sense of irony, the prosecutor "strenuously opposed" the suggestion and insisted that Ms. Soriano had to cite to some legal authority, mid-trial, for her contention that the Government had an affirmative duty to correct the record. 1 ER 43.

> [DEFENSE COUNSEL]: And so if -- but I want to put it out there because I want to -- I want to, unlike what the Government just did, I want to cite the authority that states what the law is so that the Government can see that Monica Verma stated it incorrectly.
>
> THE COURT: Okay.
>
> [DEFENSE COUNSEL]: And then have the Government tell the jury that that was incorrect.
>
> THE COURT: Let me -- let me then ask, Mr. Backe, **the** testimony from Officer Verma is that there is something in the regulations that expressly provided for the issue of the employer-employee relationship and that the fees could not be, I guess, assessed on the beneficiary, something to that effect?
>
> [PROSECUTOR]: Reimb- -- reimbursed. You couldn't seek reimbursement.
>
> THE COURT: Or seek reimbursement, unlike the current Department of Labor paragraph nine, was it. So is this something where you can assist and cite to that regulation? That can say it's not

an error of law, because it is the Government that elicited -- elicited that testimony. So...

[PROSECUTOR]: Your Honor, I would just ask that we – there has got to be a mechanism for this to be accomplished. This -- this me stand before them and correct the record, I just don't -- I need to see legal authority that that's how it's accomplished. To the extent this is incorrect, I will assist in the process, but I'm not going to -- I do not want to engage in something that we're just making up on the fly.

THE COURT: Okay.

[PROSECUTOR]: I would ask that there be some law cited as how to deal with situations such as this.

1 ER 38-39.

The Government's proposal was to recall Verma so that defense counsel could try to cross-examine her *again* on the lack of any actual legal support for her legal opinions to which she had already testified at least three times during the trial. ER 43-45.

[PROSECUTOR]: Again, I'm -- I strenuously oppose standing up and saying, I'm sorry about something I don't even know the truth of which. I will be happy -- I think it would be best to allow the Government to reopen its evidence, recall the witness, and he can go straight to Cross.

[DEFENSE COUNSEL]: Well, I already tried that. She -- I-- I do not want to try to Cross Monica Verma again because she's going to go squirrely. And she's just going to say, "Well, it's somewhere. I still haven't checked to see where it is." Why don't we do it – I mean, I would -- I would favor actually doing something in writing where the Government puts it in writing. We don't have to put Mr. Backe up there to testify.

[PROSECUTOR]: That's not how trials work, Your Honor.

Page 29 of 67

[DEFENSE COUNSEL]: Well, you also don't put up an expert in the law to get up there and misrepresent the law, and she's supposed to --she was supposed to -- they gave us supplemental -- if you look at, Your Honor, ECF 94-1 on page, I want to say, 13 of that document.

THE COURT: Uh-huh.

[DEFENSE COUNSEL]: That is where the Government produces that as a supplemental expert report to provide the basis for Monica Verma's opinion that U.S. CIS regulations prohibit the charging or getting reimbursed by petitioner -- or by respondents for a petition, and that's it. And then she's now talking about something completely different –

THE COURT: Okay.

[DEFENSE COUNSEL]: -- in her testimony that she can't identify. And it was supposed to be identified, and apparently, not that. . . .

1 ER 43-44.

At the end of the day — literally and figuratively — the Court decided over Ms. Soriano's continuing objection to require an additional disclosure from the Government regarding the supposed legal basis for Verma's opinion and to allow the Government to then recall Verma so the defense could once again cross-examine Verma, but with a supposedly new and improved expert disclosure in hand. 1 ER 56-61, 67-71.

THE COURT: Well, if it exists, it's easier to -- if it does really exist as a matter of law, then there should be a CFR, as we just pulled here, or something else. So...

[DEFENSE COUNSEL]: That's my point.

Page 30 of 67

THE COURT: So, it's easy to --

[PROSECUTOR]: Your Honor, we -- we established facts or we controvert facts through the process.

THE COURT: Well, this is not an issue of fact, it's an issue of law.

[PROSECUTOR]: No, but it's an issue of correcting her testimony.

[DEFENSE COUNSEL]: And your --

[PROSECUTOR]: And I can't -- I am sitting here guessing that she doesn't have an excuse. She doesn't have -- this, actually, if you read this, it cites to another CFR, and that's what we're releasing on.

THE COURT: Okay.

[PROSECUTOR]: Or some policy.

THE COURT: All right.

* * *

THE COURT: Okay. My thought is, Mr. Backe, you have a quicker communication link that she'll probably respond quickly is she's being recalled to testify. And, Mr. Hanson, you just pose those question, if she comes to item number three where she still hasn't looked at it, then if she doesn't come up with a response, because the third is not an option saying, I still don't know where it is. After all this time, I might have to strike that portion.

1 ER 51-52, 57-58.

The following morning, the Government recalled Verma and immediately passed the witness so that the defense could, for the third time in front of the jury, cross-examine Verma on the same subject matter of her erroneous legal opinion.

6 ER 981-987.

Unsurprisingly, Verma testified she had "looked for it," but she "was not able to find a specific regulation that stated that the petitioner is not allowed to request for reimbursement from the beneficiary. The only regulation was the one I spoke of before, which is that petitioner is required to pay the fees." 6 ER 984-985.

## Admission of the Written Statement

When the Government moved to have the Jonas drafted Written Statement admitted as an exhibit, Ms. Soriano objected. 1 ER 20. The jury was excused and the parties argued the hearsay objection. 1 ER 21-35.

In response, the Government relied on this Court's "mere language conduit for the defendant" decision in *United States v. Aifang Ye*, 808 F.3d 395, 401-02 (9th Cir. 2015).[5] 1 ER 21. The Government also argued that the Written Statement was an adopted admission and therefore not hearsay pursuant to Fed. R. Evid. 801(d)(2)(B). *Id*.

---

[5] This Court's *Aifang Ye* decision is from an appeal from this same District Court affirming a conviction involving a similar decision to allow the admission at trial of a statement written by an agent and signed by the defendant that had been interpreted to the defendant by a telephone language line interpreter. The defendant in *Aifang Ye* appears to have premised the error solely on a Confrontation Clause violation. *See United States v. Aifang Ye*, 808 F.3d at 401-02 (review of Nazemian factors and confrontation of the interpreter, but no reference to the hearsay statement itself).

Ms. Soriano argued that she never manifested an adoption of the Written Statement as something she believed to be true and, therefore, the Written Statement was the inadmissible testimonial hearsay of SA Jonas. 1 ER 21. Ms. Soriano argued that the "adopted admission" presented by the Written Statement was actually SA Jonas' *characterization* that the April 17 Written Statement was what Ms. Soriano herself actually *said* in the March 27 interrogation which Ms. Soriano argued then as she does now is a demonstrably false proposition. 1 ER 22-26 (adding "Just because she agreed with what he was saying, doesn't mean she manifested and adopted it to be her belief that it was true." She was just agreeing that he was saying that and it is written on the page."). Ms. Soriano also argued a right to confront the interpreters that translated both her oral statements in the March 27 interrogation and the interpreter that translated SA Jonas' statements in the April 17 reading of the Written Statement. 1 ER 22.

The Government's argued that "[Jonas] can say anything under the sun, and if she adopts it or agrees to it, it's now her statement." 1 ER 32. (doing what Ms. Soriano's argued was reducing a multi-factor test into a single, "did she sign it?"

test for admission under Rule 802(d)(2)(B) whether or not there was a language interpreter involved).[6]

Overruling the objection, the Court applied the four-factor interpreter trustworthiness/accuracy of the translation test from this Court's pre-*Crawford* decision in *United States v. Nazemian*, 948 F.2d 522, 527 (9th Cir. 1991), bolstered by the *Aifang Ye* statement production and execution process, and found the interpreter of Jonas' reading of the Written Statement was a mere language conduit. 1 ER 33-35. The Court admitted the Written Statement as Government's Trial Exhibit 3. 2 ER 318.

In the Memorandum Decision that followed the oral ruling during the trial, the District Court simply cited the *Aifang Ye* model for checking the accuracy of the translation as an acceptable substitute for evidence of *reliability* and, without any actual comparison of his testimony to undisputed facts in the record, and

---

[6] During the trial, the Court seemed to agreed that to avoid manifestly adopting the statements, Ms. Soriano had an obligation to expressly reject the statement apparently even if it was untrue. 1 ER 29 (Court: "'I didn't say that,'" and scratch it out. [...] Or 'I'm not adopting that statement. Not only that I never said it, but I don't adopt that right now.' Those are options that could have happened.").

presumed that the Reyes testimony "corroborated the contents of Soriano's statement." 1 ER 17-18.

### The Rule 29 Motions for Judgment of Acquittal

Immediately following the close of the Government's case-in-chief, Ms. Soriano moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29(a). 6 ER 988-994. Ms. Soriano argued that the Government had failed to prove that the alleged conspiracy had as its goal to imped, impair, obstruct or defeat the lawful government functions of USCIS. 6 ER 988. The Government's evidence suggest at most that Ms. Soriano caused a petition to be filed with USCIS in the same manner that other petitioning employers at the time were filing and that USCIS was routinely approving for consular processing of a visa with the US State Department in the petition beneficiaries' home country after USCIS approved the petitions granting the employers the CW-1 "classification" for the intended beneficiaries allowing them to take that next step. *Id*. At worst, the "conspiracy" could not have impeded any "lawful" function of USCIS as charged. *Id*.

Ms. Soriano also argued that there was insufficient evidence from which any reasonable jury could infer that Ms. Soriano did not intend for RES and the three Petition beneficiaries to have an employer-employee relationship, the crucial fact

of intentional deception in which the Government's charge was grounded. 6 ER 989-992.

Alluding to a single line in the SA Jonas' drafted statement that he had Ms. Soriano sign, the Government argued that her supposed admission was the *only* evidence bearing on Ms. Soriano's intent, or alleged lack thereof, to actually employ the beneficiaries as legitimate RES employees and, suggesting that the burden was Ms. Soriano's arguing that "there's no evidence that she intended to give them a job." 6 ER 989-990.

The Court recited the Rule 29 standard and summarily denied Ms. Soriano's acquittal motion. 6 ER 994.

Thereafter, the defense had Trial Exhibit B, 2 ER 346, admitted by stipulation in Ms. Soriano's case-in-chief and then rested. TT at 616-618. Ms. Soriano did not testify. She then renewed her Rule 29 motion for judgment of acquittal which the trial court again denied. 6 ER 1001-02.

Following closing arguments and instructions to the jury deliberations commenced and the jury returned a guilty on the sole count of the Second Superceding Indictment. *See* 2 ER 368 (Jury Verdict, Doc. No. 144; Minute Entry, July 6, 2021, Doc. No. 145). Ms. Soriano was sentenced in September 2022 to one-

month imprisonment followed by seven months of home detention and three years of supervised release. *See* Amended Judgment, 1 ER 1-7.

This appeal ensued.

## SUMMARY OF THE ARGUMENT

The indictment and prosecution of Ms. Soriano arose out of a larger investigation that involved the three beneficiaries of the Petition RES filed with USCIS to employ them after the three aliens had overstayed the expiration of their previously approved non-immigrant CW-1 employment visas for an unrelated employer. 3 ER 457-58. The investigating agents assumed based on their understanding of the history and apparent intentions of the three beneficiaries that Ms. Soriano was knowingly selling immigration "status" to the three through new RES employment even though that assumption was based on the agents' fundamental misunderstanding of the CW-1 Program itself.

Nonetheless, based on these faulty assumptions, SA Jonas interviewed Ms. Soriano and later crafted a false confession for her to sign, the incriminating substance of which amounted to SA Jonas' own conclusory assumptions based on HSI's broader ongoing investigations in which he was only newly involved. The inculpatory admission of "doing something wrong," for example, was not

something that Ms. Soriano herself had actually said or done nor even something she ever understood.

In order to bolster believability to the jury at trial of the Government's faulty assumptions turned false "confession," it enlisted the testimony of ISO Monica Verma who properly laid out the general framework for the CW-1 petition process and then improperly implicated Ms. Soriano in supposedly "prohibited conduct" related to that petition process that was, in fact, not prohibited. Nevertheless, the implications of that material testimony of wrongdoing is what the Government argued reflected Ms. Soriano's knowing and intentional "immigration status selling." That was the crux of their case.

The admission at trial of false testimony of its subject matter expert ISO Monica Verma that some unidentifiable regulation existed specifically prohibiting conduct Ms. Soriano undertook in the process of petitioning USCIS for the CW-1 employment of the Bangladeshi co-conspirators materially undermined Ms. Soriano's defense. The Government was put on notice, pre-trail, that such testimony from Verma would be false, material and prejudicial and that it would effectively deny Ms. Soriano her right to a fair trial. The Government's intentional

solicitation of that actually false testimony by Verma at trial was constitutional error that requires reversal.

Compounding the prejudice to Ms. Soriano and further assuring that she was not going to have a fair trial, the Government was permitted to admit into evidence the Written Statement, the inculpatory substance of which was a fabrication of the case agent SA Jonas that was conclusory, uncorroborated, contradicted and patently prejudicial.

The Written Statement should not have been admitted as non-hearsay statement pursuant to Fed. R. Evid. 801(d)(2) nor by any other hearsay exception because the inculpatory statements therein are not her own, are not statements that she manifestly adopted or believed to be true, they were never something that Ms. Soriano intended as an assertion and the statements, including the gratuitous admission to "knowingly doing wrong," are demonstrably unreliable.

Moreover, the *"Aifang Ye process"* SA Jonas used to obtain Ms. Soriano's Written Statement denied Ms. Soriano her rights to confront the actual "speaker" thereof — not only those made in the March 27 interview with SA Jonas by the language line interpreter utilized therein, but by SA Jonas himself in the April 17 review and signing of *his* Written Statement. SA Jonas' ability to defer to the

Written Statement that he himself drafted and effectively avoid testifying based on his own, independent recollection of statements Ms. Soriano actually made on March 27 deprived Ms. Soriano of her right to confront SA Jonas as the admitted maker of the statements that were admitted at trial via the Written Statement.

The *Aifang Ye* process where an interpreter is employed as a "mere language conduit" cannot be used as a shield to the Confrontation Clause in order to facilitate the admission of fabricated facts and false confessions of wrongdoing with no realistic opportunity for the defendant to cross-examine the law enforcement agent that actually made the statements.

Finally, without the false testimony of ISO Verma and the false confession in the Written Statement, there was a patent lack of evidence at trial that Ms. Soriano knew that the three Bangladeshi beneficiaries of the RES Petition to USCIS never intended to return to Bangladesh, process their CW-1 visas as the US Embassy in Dhaka and return to Saipan to commence the employment with RES contemplated by the Petition.

While the material, false testimony of Verma solicited by the prosecutor demands reversal and the erroneous admission of the prejudicial Written Statement also demands a new trial, without both of those pieces of improper

evidence, there was simply no evidence from which any of the jurors could have found Ms. Soriano guilty beyond a reasonable doubt of the conspiracy to defraud the United States as charged. Judgment of acquittal is the proper remedy.

## ARGUMENT

**I.    The Government's Intentional Solicitation of False Testimony from Monica Verma Was Material Constitutional Error.**

### 1.    Standard of Review

A prosecutor has an independent, constitutional duty to correct testimony he knows to be false. *Napue v. Illinois*, 360 U.S. 264, 269-70, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); *N. Mariana Islands v. Bowie*, 243 F.3d 1109 (9th Cir. 2001); *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006). "[A] criminal defendant is denied due process of law when a prosecutor either knowingly presents false evidence or fails to correct the record to reflect the true facts when unsolicited false evidence is introduced at trial." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc).

When reviewing that non-structural constitutional error, this Court applies an *Agurs* materiality standard and determines whether there is "'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Hayes v. Brown*, 399 F.3d at 984 (quoting *Belmontes v. Woodford*, 350 F.3d 861, 881

(9th Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

Under this materiality standard, "'[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Hayes v. Brown*, 399 F.3d at 984 (quoting *Hall v. Director of Corrections*, 343 F.3d 976, 983-84 (9th Cir. 2003) (per curiam) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

If there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury," the conviction must be set aside. *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

> 2. **The prosecutor intentionally solicited trial testimony he knew or should have known was false.**

Here, ISO Verma testified repeatedly that there was some unspecified USCIS and/or a broader DHS regulation in effect at the time RES submitted the Petition here which regulation explicitly prohibited a petitioning CW-1 employer from being reimbursed from the intended beneficiaries the USCIS filing fees paid

and other costs incurred by the employer in processing the non-immigrant

employment authorization. 3 ER 592, 631-32. Verma was never able to cite to any

specific regulation that effected this supposed illegal cost reimbursement because,

at the time the Petition was submitted, there was no such regulation. *Id*.[7]

Despite repeated warnings from the defense pre-trial that it was going to

happen and notwithstanding the prosecutor's pre-trial assurances that he would

not solicit groundless legal opinions from the Government's subject-matter expert

ISO Verma at trial, the prosecutor nonetheless intentionally solicited testimony

---

[7] Verma was the government's "subject matter expert" on this particular subject matter and the Government's pre-trial disclosures on the regulatory authority for her proposition was, in total:

(5) Petition requirements

An employer who seeks to classify an alien as a CW-1 worker must file a petition with USCIS and pay the requisite petition fee plus the CNMI education fee of $150 per beneficiary per year. An employer filing a petition is eligible to apply for a waiver of the fee based upon inability to pay as provided by 8 CFR 103.7(c). If the beneficiary will perform services for more than one employer, each employer must file a separate petitioner with fees with USCIS.

*See* 2 ER 103.

from Verma that he knew or should have known had no basis in the law. 1 ER 158, 166, 168-169.

Arguably conceding thereafter that Verma's testimony was actually false, i.e., that there was no legal basis for the legal opinion to which Verma repeatedly testified, the prosecutor "strenuously opposed" correcting the record himself despite it being his constitutional duty to do so. 1 ER 43. Instead, the prosecutor suggested and the Court concurred, that the proper remedy for Verma's false trial testimony was to make the defense cross-examine the Government's troublesome "expert" *again* to see if she would, herself, correct her previously unequivocal false testimony. 1 ER 43. And, the prosecutor suggested, if Verma did not correct her own false testimony regarding nonexistent federal regulations during this third round of cross-examination, "we can give a jury instruction" and that, presumably, would be enough to effect a constitutionally sufficient correction of her false testimony. 1 ER 57.

First, the fact that the prosecutor was on notice of Verma's false contentions through extended pre-trial proceedings and compelled disclosure supplements and then intentionally solicited the false testimony based on the same false contentions about which the prosecutor was on notice should foreclose"correction" as a

sufficient remedy for the intentional conduct. *See, e.g., Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (defendant denied due process when a prosecutor knowingly presents false evidence).

Moreover, no amount of additional cross-examination of Verma by the defense could have been sufficient to eliminate the prejudice caused by the unequivocal, false testimony earlier in the trial even if it was unsolicited by the prosecutor himself. *Hayes v. Brown*, 399 F.3d at 984 ("criminal defendant is denied due process of law when . . . a prosecutor fails to correct the record to reflect the true facts when unsolicited false evidence is introduced at trial").

Once the government solicited and received false testimony from Verma, knowingly or not, the damage was done and certainly nothing short of the prosecutor himself telling the jury that Verma's information was incorrect, that she should have known better and that he should never have questioned her on the subject of petition fees and costs which are a non-issue in the case could have come close to a fix. But even the efficacy of a correction of that magnitude is questionable.

Page 45 of 67

### 3. It is reasonably likely that Verma's false testimony could have affected the judgment of the jury in the trial below.

The factual proposition that Ms. Soriano obtained reimbursement of fees costs from the alien beneficiaries of the Petition was integral to the Government's argument at trial that the Petition was a sham. *See*, *e.g.*, 3 ER 419-420 (Government opening arguments) ("Now, importantly, Mr. Khan told her that his petition was just being submitted to give the three men legal status. And they were going to find work other — elsewhere after the petition was approved. This Defendant agreed as a favor for Mr. Khan, but also for money; $900 per person"); 3 ER 422 ("So she took the men's passport and information and gave it to Mr. Reyes in exchange for money, told him to type it up.").

> She received payment. The Defendant received payment from each of the Bangladeshis. All right. She got $900 for each Bangladeshi for them to get their CW-1 visas. That's an overt act. She received payment.

6 ER 1007 (Government's closing argument).

Particularly given the Government's reliance on the supposed illegality of USCIS fee reimbursements from the beneficiaries of CW-1 Only non-immigrant worker petitions and the Government's repeated suggestion to the jury that Ms. Soriano was, in effect, selling the alien beneficiaries "visas" or "status" (which itself

Page 46 of 67

was legally incorrect), Verma's inarguably false testimony in Ms. Soriano's trial more than meets the *Agurs* materiality test.

Moreover, Verma's "corrective" testimony was equivocal, open-ended and far from a disavowal of her unequivocal false testimony the day before and an acknowledgment that she was completely wrong. 6 ER 984 ("I was not able to find a specific regulation"). The marginal backtracking of Verma did not in fact, and arguably could not have in concept, "corrected" the damage her unequivocal false prior testimony wreaked on Ms. Soriano's trial.

"When a prosecutor suspects perjury, the prosecutor must at least investigate." *Morris v. Ylst*, 447 F.3d 735, 744 (9th Cir. 2006). Where it is established that the government knowingly permitted the introduction of false testimony, "reversal is virtually automatic." *Hayes v. Brown*, 399 F.3d at 978 (internal quotation marks and citations omitted). Because that is the case here and the false testimony was material, Ms. Soriano's conviction cannot stand.

II.   **The Written Statement Was Patently Unreliable in Various Material Respects and its Admission Against Ms. Soriano at Trial Was Improper, Prejudicial and Affected the Outcome of the Case.**

1.   **Standard of Review**

Generally, a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *See United States v. Cox*, 963 F.3d 915, 924 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1281 (2021). Such rulings will be reversed for an abuse of discretion only if such non-constitutional error more likely than not affected the verdict. *See United States v. Edwards*, 235 F.3d 1173, 1178 (9th Cir. 2000). However, whether the district court correctly construed the hearsay rule is a question of law reviewed *de novo*. *See United States v. Johnson*, 875 F.3d 1265, 1278 (9th Cir. 2017). *See also United States v. Lindsay*, 931 F.3d 852, 859 (9th Cir. 2019) (the district court's construction or interpretation of the Federal Rules of Evidence is a question of law subject to de novo review). Whether particular evidence falls within the scope of a rule of evidence is also reviewed de novo. *See United States v. Duenas*, 691 F.3d 1070, 1079 (9th Cir. 2012).

In reviewing a district court's evidentiary rulings, "the selection of the applicable standard of review is contextual: The de novo standard applies when issues of law predominate in the district court's evidentiary analysis, and the abuse-

of-discretion standard applies when the inquiry is essentially factual." *United States v. Mateo-Mendez*, 215 F.3d 1039, 1042 (9th Cir. 2000) (internal quotation marks omitted); *United States v. Haines*, 918 F.3d 694, 697 (9th Cir. 2019) (reviewing evidentiary rulings for abuse of discretion, though reviewing de novo interpretation of Federal Rules of Evidence and whether rulings violated defendant's constitutional rights).

> **2.** **The Written Statement was testimonial hearsay that lacked sufficient indicia of reliability and its admission at trial was prejudicial reversible error.**

At trial, Ms. Soriano objected to her April 17 signed Statement as the product of unreliable hearsay and also on Sixth Amendment Confrontation Clause grounds. 1 ER 9, 13 (Memorandum Decision at 1, 4). The trial court allowed the admission of the Written Statement at trial over Ms. Soriano's objection citing *United States v. Nazemian*, 948 F.2d 522, 526 (9th Cir. 1991) and its Ninth Circuit progeny and finding that the Written Statement was admissible hearsay that did not violate the Confrontation Clause because (1) Ms. Soriano signed the Written Statement and (2) the language interpreter that translated the April 17 Statement to Ms. Soriano was a "mere language conduit." 1 ER 14-18 (applying the four-factor *Nazemian* test).

Ms. Soriano obviously cannot ignore this Court's interpretation of the continuing precedential effect of the *Nazemian* line of cases in this Circuit. *See, e.g., United States v. Orm Hieng*, 679 F.3d 1131, 1141 (9th Cir. 2012) (*Nazemian* not clearly inconsistent with *Crawford* line of cases.); *United States v. Aifang Ye*, 808 F.3d 395, 401 (9th Cir. 2015) (same). Whether or not this case is an appropriate case for *en banc* review of the *Nazemian* precedent, post-*Crawford v. Washington*, 514 U.S. 36 (2004), *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009) and *Bullcoming v. New Mexico*, 564 U.S. 647 (2011),[8] Ms. Soriano submits that there are factors that distinguish this case from the *Nazemian* line of 9th Circuit cases. *See, e.g., United States v. Nazemian*, 948 F.2d 522, 525-26 (9th Cir. 1991) (under appropriate circumstances, a person may testify regarding statements made by the defendant through an interpreter without raising either hearsay or Confrontation Clause issues because the statements are properly viewed as the defendant's own, and the defendant cannot claim that he was denied the opportunity to confront himself).

---

[8] As Judge Berzon has written separately to suggest on more than one occasion. *See, e.g., United States v. Orm Hieng*, 679 F.3d at 1145 (Berzon, J. concurring); *United States v. Romo-Chavez*, 681 F.3d 955, 962 n.1 (9th Cir. 2012) (Berzon, J. concurring).

Here, the Written Statement was not Ms. Soriano's own nor was it a verbatim record of her contemporaneous interpreted statements from the March 27 interview where the legal fiction that an interpreter was acting as *her* agent would apply.[9] *Cf. United States v. Orellana-Blanco*, 249 F.3d 1143, 1148-49 (9th Cir. 2002) (unpublished) (evidence did not support an inference that the statement was a verbatim record of what the defendant said; *United States v. Gutierrez-Salinas*, 640 Fed. Appx. 690, 692-93 (9th Cir. 2016) (unpublished) (two signed RSS and interpreter involved. 1st statement: "Translator and administrating officer . . . recorded [defendant's] answers verbatim . . ." at 692 insufficient evidence that it was a verbatim record of what the defendant said (citing *United States v. Orellana-Blanco*)).

Moreover, there is scant evidence of what Ms. Soriano actually said in that March 27 interview, but what evidence there is broadly contradicts the gratuitous, inculpatory portions of the later Written Statement and belies the professed knowledge and understanding of her wrongdoing attested therein. As in the case

---

[9] *See, e.g.,* Jonas testimony at 5 ER 862 (Written Statement "not verbatim" just "a summary that we were going to present to her that's outside of an ROI"); 908 (interrogation notes "not verbatim of what happened in an interview, they are .... they're just notes."); 917-18 (same); 925 (same); 928 ("this is not a transcript. It's not one hundred percent verbatim.").

of *United States v. Felix-Jerez*, 667 F.2d 1297, 1302 (9th Cir. 1982), the confession of legal wrongdoing that SA Jonas included in the Written Statement was obviously included "for the express purpose of using it to prosecute the defendant."

In this case, Ms. Soriano would add that the Jonas manufactured statements were included in the Written Statement to take advantage of the District Court's seemingly blind adherence to its own precedent making procedure in the *Aifang Ye* case effectively allowing SA Jonas to avoid testifying to his own independent recollection of the March 27 interrogation of Ms. Soriano. *Cf. United States v. Orm Hieng*, 679 F.3d 1131, 1136 (9th Cir. 2012) (interviewing agent testified as to what he actually heard in the interview, not to a written statement he had created later); *United States v. Romo-Chavez*, 681 F.3d 955, 958-59 (9th Cir. 2012) (same); *United States v. Garcia*, 16 F.3d 341, 344 (9th Cir. 1994) (same).

Ms. Soriano submits that this case does not present a *Nazemian* issue, at least not with the regarding to the April 17 reading of the Written Statement. The "mere language conduit" agency for the Written Statement was that of Jonas and the interpreter. Arguably, Ms. Soriano made little or no statements in that second meeting and, arguably, nods and "verbals" were not interpreted by the telephonic language-line interpreter anyway.

To the extent that the March 27 interview was interpreted, SA Jonas was either unable or unwilling to testify to many of the more dubious statements allegedly made in that actual interview instead deferring to the Written Statement itself. *See, e.g.*, 5 ER 912 (Jonas referring to the most gratuitous and inculpatory paragraph of the Written Statement: "In totality of the interview, if I put it in there, [the words did come out of her mouth].”); 917 (same).

This case presents a more traditional type of hearsay problem involving a supposed adopted admission, but as discussed further below, because of the *Aifang Ye* testimonial hearsay shield and SA Jonas' inability or unwillingness to testify directly based on his independent recollection in light thereof, it still presents a Confrontation Clause problem. *See, e.g., United States v. Orellana-Blanco*, 249 F.3d 1143, 1151 (9th Cir. 2002) (unpublished) ("under the confrontation clause, Orellana-Blanco was entitled to confront Officer Kendall in cross-examination to test the accuracy of what the exhibit claimed Orellana-Blanco had said").

3.     The use of the *Aifang Ye* written statement process to shield SA Jonas from cross-examination regarding the actual statements Ms. Soriano made during her March 27 interrogation violated her Confrontation Clause rights.

Notwithstanding that this case, in the context of SA Jonas as the testimonial speaker of the Written Statement, could be viewed as one outside the actual Confrontation Clause scenario of *Nazemian* and its progeny because SA Jonas, the actual testimonial statement maker, was cross-examined at trial. Still, though, the *Ai Fang Ye* "procedure" employed by the government agents in this case effectively denied Ms. Soriano the right to confront the statements themselves. *Cf. United States v. Gutierrez-Salinas*, 640 Fed. Appx. 690, 692-93 (9th Cir. 2016) (unpublished) (two signed RSS and interpreter involved. 1st statement: "Translator and administrating officer . . . recorded [defendant's] answers verbatim . . ." at 692 (citing *United States v. Orellana-Blanco*) (2nd statement: "was the declaration of the form's author" who did not testify so insufficient evidence that it was a verbatim record of what def said. Also cannot conclude that translations accurate because no info re interpreter. at 692-93).

As employed by agents in this District, the *Aifang Ye* procedure is obviously intended to mimic a *Nazemian*-style issue for which our District Court then

presumes that the statement is non-hearsay because of the "interpreter as a language conduit" fiction and never actually performs its gate keeping function with regard to the testimonial hearsay statements themselves which, Ms. Soriano submits, is not an adopted admission without more.

Here, the Written Statement is at best, part information learned from SA Jonas' March 27 interview of Ms. Soriano and part cherry-picked information learned from other sources before and after the March 27 interview, topped with a heavy helping of SA Jonas' own suppositions and his arguably under-informed determination that whatever was gong on was "wrong" and Ms. Soriano should agree that "it" was wrong — regardless of whether "it" was actually true and, if true, whether "it" was indeed "wrong" as that word implicates a fraudulent act under 18 U.S.C. § 371.

Fundamentally, the *Nazemian* analysis should not obviate a separate inquiry by the trial court into the *reliability* of the testimonial hearsay itself in blind deference to the "accuracy of the translation." Here, the trial court conflated traditional hearsay and *Nazemian*/Confrontation Clause inquiries ignoring contradictory facts and evidence that undermined the efficacy and reliability of the Written Statement on the whole in favor of the *process* that the Case Agent

followed. 1 ER 18 (Memorandum Decision) (The interpreter acted as a mere language conduit, and therefore based on Federal Rule of Evidence 801(d)(2)(B), her written statement qualifies as one that she 'adopted or believed to be true.' No Confrontation Clause issue exists.").

In denying Ms. Soriano's trial objection and admitting the Written Statement, the trial court characterized the issue as one, at most, of the weight of the evidence not, as Ms. Soriano has continually argued, a threshold inquiry into the reliability and, therefor the admissibility, of the out-of-court statements in the first place. 1 ER 18.

By allowing the *Aifang Ye* model to persist, the Court permits the government to project a speculative and untrue scenario to the jury, *e.g.*, in this case that the Written Statement is actually something that Ms. Soriano said and did, knowingly and intentionally, almost two years earlier in 2018. Where, as here, the inculpatory substance of such fabricated statement is not the case, cross-examining the agent that actually "said" those things while the agent shields himself from independent recollection behind his own non-verbatim fabrication does not effect a true exercise of the defendant's right to confront her accuser.

In this case, because the statements cannot be viewed as Ms. Soriano's own, it cannot be said that she is only being denied the opportunity to confront herself. *See United States v. Nazemian*, 948 F.2d 522, 525-26 (9th Cir. 1991). Admission of false testimonial hearsay statements under any legal fiction should be systemically discouraged not institutionally entrenched as a short-cut means to an end. The Government's use of the *Aifang Ye* shield should be repudiated.

Here, admission of the Written Statement was error and it was not harmless. In the end, exclusion of the wrongfully admitted Written Statement negates any reasonable inference that Ms. Soriano could have had the knowledge of the wrongfulness of her actions nor the intent to deceive the USCIS. Without the Written Statement, there was insufficient evidence from which the jury could reasonably infer that Ms. Soriano became a member of a conspiracy to defraud USCIS knowing of its illegal objective and intending to accomplish it.

III.   **Without False Testimony and Inadmissible Hearsay, There Was Insufficient Evidence at the Trial from Which Any Reasonable Juror Could Have Found Ms. Soriano Guilty of a Conspiracy to Defraud the United States Beyond a Reasonable Doubt.**

1.  **Standard of Review**

After the close of the government's case, Ms. Soriano moved pursuant to Fed. R. Crim. P. 29(a) for judgment of acquittal. 6 ER 988-994. The Court denied the Motion. *Id*. Ms. Soriano renewed her motion for judgment of acquittal after the close of all evidence which motion was again denied. 6 ER 1001-02. Accordingly, this Court reviews *de novo* Ms. Soriano's claim challenging the sufficiency of the evidence introduced at her trial. *See United States v. Bennett*, 621 F.3d 1131, 1135 (9th Cir. 2010); *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). A claim of insufficient evidence fails if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under *Jackson*, the Court "begins by viewing the evidence produced at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1169 (9th Cir. 2010) (en banc). Then, "[m]oving to the second step of *Jackson*, [the Court] must

consider whether the evidence, as construed above, is sufficient to allow any rational juror to conclude that the government has carried its burden of proof." *Id.*

> ## 2. There was insufficient admissible evidence at trial from which any reasonable juror could have found Ms. Soriano guilty of a conspiracy to defraud the United States.

The evidence at trial was insufficient as a matter of law to find, beyond a reasonable doubt, that Ms. Soriano conspired with others to defraud the United States by obstructing the lawful functions of USCIS with a sham I-129CW employment "classification" Petition.

In order to convict for any offense, the prosecution must prove each element of the charge beyond a reasonable doubt. *United States v. Atkinson*, 990 F.2d 501, 502 (9th Cir. 1993). Evidence sufficient to support a conviction cannot be a product of suspicion or speculation. *See Mikes v. Borg*, 947 F.2d 353, 357-60 (9th Cir. 1991) (murder conviction reversed when jury left to speculate regarding the time frame when defendant's fingerprints were imprinted on gun); *United States v. Burton*, 324 F.3d 768, 770 (5th Cir. 2003)(evidence insufficient to prove interstate commerce element as jury left to speculate whether the automobile at issue was manufactured outside of Mississippi).

A factual inference or conclusion is not reasonable if it is only a guess or a possibility. *Id. See also United States v. Thomas*, 453 F.2d 141, 143 (9th Cir. 1971) (mere suspicion or speculation cannot be the basis for the creation of logical inferences to substantiate conviction). Therefore, "[w]hile all inferences must be made in favor of the prosecution, leaps of logic should not be." *Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 2004). *See also Thomas*, 453 F.2d at 143.

At the trial here, the jury was instructed on the elements of the conspiracy to defraud as follows:

> First, between on or about August 1, 2018 and on or about February 11, 2019, there was an agreement between two or more persons to defraud the United States by obstructing the lawful functions of a specific government agency—here, U.S. Citizenship and Immigration Services ("USCIS")—by deceitful or dishonest means;

> Second, the defendant became a member of the conspiracy knowing of its object and intending to help accomplish it; and

> Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy, with all of you agreeing on a particular overt act that you find was committed.

Excerpt from Final Jury Instructions, 2 ER 87-88.

Arnold Reyes' testimony made clear that Ms. Soriano was "incapable" of "anything that has four-letter writing." 4 ER 781, 790-91. She relied on Arnold

expertise and is judgment with regard to the substance and of petitions to USCIS for CW-1 worker classification and the preparation of supporting documents including the Petition here. 4 ER 779-781.

Moreover, with the exception of conclusory and inculpatory "admissions" is the demonstrably unreliable Statement that SA Jonas created and had her sign, there was no evidence that Soriano knew that the three worker beneficiaries of the Petition did not intend to actually work for RES. Indeed, the Petition itself contemplated exactly that, *i.e.*, that the beneficiaries would return to Dhaka and process CW-1 visas at the US Embassy in order to return to Saipan as employees of RES. 2 ER 206. Moreover, Verma suggested that the "return to consular process" eventuality evident from the USCIS Petition File as a possible reason why USCIS actually approved the Petition for classification. 3 ER 622-23.

Moreover, any inferences that could be drawn from the fact that Ms. Soriano was reimbursed from each of the beneficiaries for the costs associated with their hiring through the CW-1 Program should be disregarded given the false testimony from Verma that such reimbursements were prohibited by regulation and, thus, illegal.

The crux of the alleged fraudulent conduct in this case was the alleged sham employment, i.e., that Ms. Soriano had agreed with at least co-conspirator Halim Khan that, as a favor to him and in exchange for money, Ms. Soriano would have RES file a petition with USCIS just to get three of his relatives immigration status and that those involved agreed that the relative beneficiaries of the petition were not actually going to be employees of RES. 3 ER 419-422; 6 ER 1007, 1021.

Nothing in the Petition itself actually suggests those facts. Instead, as Arnold Reyes testified, Reyes not Ms. Soriano determined though his experience with USCIS' past I-129CW adjudications in similar situations for other petitioning employers that it was perfectly acceptable to file the Petition at issue in this case on the basis that the three Bangladeshi beneficiaries would have their CW-1 "classification" approved by USCIS, return to Bangladesh to consular process visas through the US Embassy in Dhaka, Bangladesh and then return to Saipan as employees of RES. 4 ER 795-804.

Even the "unauthorized Kanoa Resort contract" upon which the Government projected evil motives at trial was nothing less than evidence that Kanoa Resort could and likely would have source some of its manpower needs from RES upon the CW-1 beneficiaries return from Bangladesh with work

authorization. 3 ER 649 ("contract" did not obligate Kanoa to any services from RES). But there was no testimony that Ms. Soriano even knew that Halim Khan was not authorized to enter into such a place-holder agreement with RES.

It was really only the conspiratorial liberties taken by SA Jonas in the Written Statement that implicated Ms. Soriano in a conspiracy to "sell status," bolstered, of course, by ISO Verma's false testimony that getting money from the beneficiaries was "prohibited by law."

Without that wrongfully admitted evidence, and assuming arguendo that there was enough evidence left in Ms. Soriano's trial to prove a conspiracy <u>between the other individuals</u>, the Government fell far short of its burden of proving that *Ms. Soriano* "became a member of the conspiracy knowing of its object and intending to help accomplish it." *Cf. United States v. Orellana-Blanco*, 249 F.3d 1143, 1148-49 (9th Cir. 2002) (unpublished) (wrongful admission of a record of sworn statement of defendant in marriage sham case not harmless).

Because there was insufficient admissible evidence at trial from which any juror could have found beyond a reasonable doubt that Ms. Soriano conspired to defraud the United States as charged, her conviction cannot stand.

## CONCLUSION

Based on the foregoing, the Court should find that (1) the Verma false testimony was improper and material, (2) Ms. Soriano's signed statement was inadmissible hearsay and (3) without the Verma false testimony and Ms. Soriano's signed statement there was insufficient evidence at trial from which any reasonable juror could have found Ms. Soriano guilty of a conspiracy to defraud the United States and, in light thereof, the Court should vacate Ms. Soriano's conviction and mandating or directing the entry of a judgment of acquittal.

Respectfully submitted this 26th day of June, 2023 (PDT).

/s/ Mark B. Hanson
MARK B. HANSON

Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738 P.O. Box 10,000
Saipan, N. Mariana Islands 96950
Telephone: (670) 233-8600
E-mail:      markbhanson@gmail.com

Attorney for *Defendant Servillana Soriano*

## STATEMENT OF RELATED CASES

Pursuant to Cir. R. 28-2.6, Appellant Soriano identifies the following related

case currently pending in this Court:

|  |  |
|---|---|
| Case Name: | United States of America v. Halim Khan |
| Docket Number: | 23-480 |
| Originating Case Number: | 1:20-cr-00007-RVM-2 |
| Relationship to this Case: | Co-defendant/co-conspirator tried and convicted in a separate jury trial in the District of the Northern Mariana Islands for the same conspiracy to defraud the United States |

DATED this 26th day of June, 2023 (PDT).

/s/ Mark B. Hanson
_____
MARK B. HANSON

Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738 P.O. Box 10,000
Saipan, N. Mariana Islands 96950
Telephone: (670) 233-8600
E-mail: markbhanson@gmail.com

Attorney for *Defendant Servillana Soriano*

**CERTIFICATE OF COMPLIANCE**
**PURSUANT TO FED. R. APP. P. 32(A)(7)(C) AND CIR. R. 32-1**
**APPEAL NO. 22-10229**

I certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the foregoing opening brief is proportionately spaced, has a typeface of 14 points and contains less than 14,000 words. Specifically, the opening brief contains approximately 13,907 words as determined by the word count feature contained in WordPerfect (not including Statement of Related Cases and Certificates).

DATED this 26th day of June, 2023 (PDT).

/s/ Mark B. Hanson
_____
MARK B. HANSON

Second Floor, Macaranas Building
Beach Road, Garapan
PMB 738 P.O. Box 10,000
Saipan, N. Mariana Islands 96950
Telephone: (670) 233-8600
E-mail:      markbhanson@gmail.com

Attorney for *Defendant Servillana Soriano*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on this 26th day of June, 2023 (Pacific Daylight Time).

/s/ Mark B. Hanson

_____

MARK B. HANSON, ESQ.